IN THE SUPREME COURT OF MISSISSIPPI
NO. 94-CA-00172-SCT

*WILLIAM C. TOUCHSTONE*

*v.*

*MONNA AILENE TOUCHSTONE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/19/94 |
| TRIAL JUDGE: | HON. GERALD E. BRADDOCK |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PAULA N. STENNETT-YANCEY |
| ATTORNEYS FOR APPELLEE: | J. MACK VARNER |
| | SAMUEL D. HABEEB |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 10/10/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/31/96 |

**BEFORE PRATHER, P.J., McRAE AND MILLS, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from a January 21, 1994 order of the Humphreys County Chancery Court denying and dismissing Dr. William Touchstone's motion seeking modification of the physical custody of his son, Wesley Carlisle Touchstone. Dr. Touchstone contends that the chancellor erred in not finding that the mother's alleged violent outbursts and her attempts to build a case of child sexual abuse against the father were a substantial change of circumstances warranting a change in custody. He further asserts that Monna Touchstone should not have been allowed to invoke the Rule 503 psychotherapist-patient privilege so as to keep a licensed clinical social worker from testifying regarding the mother's interference with and "coaching" of the child while he was being examined. Dr. Touchstone raises several other evidentiary issues as well. Although the Rule 503 privilege does not extend to licensed clinical social workers, we find that any error in excluding the testimony was harmless since the mother freely acknowledged her participation in the examination session. Finding that the chancellor properly focused on the best interests of the child in determining not to make a change in custody, we affirm his decision.

I.

¶2. Monna and William Touchstone were granted a divorce on grounds of irreconcilable differences

by the Humphreys County Chancery Court on November 10, 1992. Pursuant to the Child Custody and Property Settlement Agreement entered into by the parties, Monna Touchstone was awarded primary care, custody and control of the minor child, Wesley, born December 29, 1990. The parents shared joint legal custody and Dr. Touchstone was granted visitation on the first and third weekends of each month, as well as on various holidays.

¶3. Asserting that Dr. Touchstone had harassed her, exhibited violent behavior during "visitation swaps," and caused the child to become "confused, angry and full of hatred," Monna Touchstone filed a Motion for Citation for Contempt, Motion for Modification of Former Decree and Motion for Restraining Order and Permanent Injunction on April 15, 1993.

¶4. On November 2, 1993, Dr. Touchstone filed his Motion for Modification of Final Judgment, for Citation of Contempt, for Restraining Order and Permanent Injunction, and Complaint for Damages. He asserted that there had been a substantial change in circumstances warranting modification in the custody arrangement, charging that his former wife "has demonstrated mental instability, hysteria and an inability to control her anger" and that she had attempted to brainwash Wesley into believing he had been sexually molested by his father. He further raised claims of slander and intentional infliction of emotional distress, seeking both compensatory and punitive damages.

¶5. After a three-day hearing, the chancellor found that within days after the divorce was final, "the parties commenced a vendetta between themselves" and that "[t]he proof shows immediately following subsequent to the divorce, both parties vented their ire and frustration at the other and neither is blameless." He found, however, that there was "no parental behavior that poses clear danger to the minor's mental or emotional health to justify a change in custody" and that there had been no material change in circumstances adverse to the child's best interests. The chancellor therefore denied Dr. Touchstone's motion to modify primary physical custody, but increased his visitation time with his son, and enjoined the parties from bringing other people with them, "particularly girlfriends and/or boyfriends," when picking up and delivering Wesley.

¶6. Aggrieved by the chancellor's refusal to grant him primary custody of his son, Dr. Touchstone now asks this Court to determine whether the chancellor erred in not finding that there had been a change in circumstances since 1992 and that it would be in Wesley's best interests to be placed in his father's custody; in allowing Monna Touchstone to invoke the Rule 503 psychotherapist-patient privilege to prevent a licensed clinical social worker from testifying regarding her examination of the child; and in not admitting certain evidence Dr. Touchstone sought to introduce.

II.

¶7. A series of unpleasant incidents occurring after the November, 1992, divorce form the basis of Dr. Touchstone's assertions that there has been a material change in circumstances warranting a change in custody of their minor child, Wesley, as well as of Monna Touchstone's contention that custody should not be modified. These incidents are related only by their association with weekend visitation exchanges and their occurrence in the presence of the child. Each involved the exchange of vicious, profanity-laden accusations and insults between the parties. The battle was heightened by Monna's inferences that Dr. Touchstone had sexually abused the child. She testified that she took Wesley to see two clinical social workers, Rivers Carpenter and Brenda Chance, because of her concern about Wesley's behavior. She alleged that he was making "disturbing" statements such as

"I've touched my Daddy's peepee. My Daddy touches mine," and "My Daddy puts his penis on my face." Dr. Wood Hiatt, however, who observed Wesley and Dr. Touchstone, testified that the two had a good father-son relationship.

III.

¶8. In matters concerning child custody, "this Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." *Smith v. Jones*, 654 So. 2d 480, 485 (Miss. 1995)(quoting *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991)). Furthermore, the chancellor's findings will not be disturbed when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard. *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995); *Smith,* 654 So. 2d at 485; *Chamblee v. Chamblee,* 637 So. 2d 850, 860 (Miss. 1994).

IV.

¶9. "In all child custody cases, the polestar consideration is the best interest of the child." *Sellers v. Sellers,* 638 So. 2d 481, 485 (Miss. 1994); *Moak v. Moak,* 631 So. 2d 196, 198 (Miss. 1994). This Court has held that the prerequisites to the modification of a child custody agreement are: "(1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody." *Smith v. Jones,* 654 So. 2d 480, 486 (Miss. 1995). There must be sufficient evidence in the record supporting the chancellor's opinion for this Court to say that the chancellor has not abused his discretion. *Id.* "When the environment provided by the custodial parent is found to be adverse to the child's best interest, *and . . . the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly." *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996).

*¶10.* Dr. Touchstone contends that Monna's behavior during visitation exchanges, coupled with her inferences that he had sexually abused the child, constitute a change in circumstances adversely affecting Wesley and warranting a change in custody. He further asserts that after he was granted extended visitation privileges, Monna quit her job and moved with Wesley to Fort Lauderdale, Florida without first notifying him. He also states in his brief that he "is again in court trying to get telephone contact and visitation with his child." There is no evidence in the record of these developments nor has this Court been advised of any further proceedings in the chancery court. We consider only those matters that actually appear in the record and will not rely on mere assertions in briefs. *American Fire Protection, Inc. v. Lewis,* 653 So. 2d 1387, 1390 (Miss. 1995). Moreover, we will not hold the trial court in error for matters not placed before it. *Touart v. Johnston,* 656 So. 2d 318, 321 (Miss. 1995).

¶11. Looking first at Dr. Touchstone's assertion that his former wife's interference with visitation privileges amounts to a change in circumstances, we note that the testimony at the hearing focused on a handful of truly nasty incidents between the Touchstones, all of which happened to take place when young Wesley was being picked up or delivered by his father. As the chancellor astutely observed in his written finding of facts, "the parties commenced a vendetta between themselves" and "[t]he proof shows immediately following subsequent to the divorce, both parties vented their ire and

frustration at the other and neither is blameless." From the record, it appears that the incidents complained of are more the result of the parties' animosity toward each other rather than a reflection of either's fitness as parents.

¶12. Dr. Touchstone bases his assertion that Monna's interference with visitation rights warrants a change in custody on *Ash v. Ash,* 622 So. 2d 1264 (Miss. 1993). In that case, however, the mother's continued refusal to comply with custody and visitation arrangements pursuant to the divorce decree had resulted in "a dispute which two prior chancellors and six attorneys, in more than ten (10) court proceedings, tackled and could not settle." *Ash,* 622 So. 2d at 1266. This Court noted that the chancellor's decision to change custody to the father was correct in light of this "difficult" case, but that "this case should not be considered as establishing precedent for the taking of such drastic action in visitation disputes." *Id.* Moreover, as distinguished from *Ash*, there is no evidence in the record before this Court that Monna Touchstone refused to allow Dr. Touchstone to see his child or that any court orders had been violated.

¶13. Relying on *Newsom v. Newsom,* 557 So. 2d 511 (Miss. 1990), Dr. Touchstone further contends that Monna's allegations that he had sexually abused Wesley, not raised in any pleadings but by the inferences she made in counseling sessions when, by her own admission, she directed the child to demonstrate "how Daddy touches your peepee . . . ," warrant a change in custody. *Newsom* was a highly-publicized case in which the mother's allegations against the father resulted in the children being subjected to numerous physical and psychological examinations, details of which were revealed to the press. *Newsom*, 557 So. 2d at 512-513. The chancellor's decision in that case to change custody from the father to the mother was not based entirely on the fact that the mother "had subjected the children to numerous unwarranted physical and psychological examinations, not for treatment, but for investigation and interrogation," but also on findings that the mother had changed jobs, residences and day care arrangements frequently after the divorce, and the daughter had exhibited considerable stress when returned to her mother after visitations. *Id*. at 516. This Court further found that the mother's "apparent instability and previous abduction of the children in defiance of the court order" justified the chancellor's restriction of her visitation privileges under the terms of the new custody order. *Id.* at 517. The record in the case *sub judice* sets forth no such extenuating circumstances.

¶14. In cases where the argument for a change in custody is built upon specific isolated incidents, we have found that "[a]n isolated incident, e.g., an unwarranted striking of a child, does not in and of itself justify a change of custody." *Smith*, 654 So. 2d at 487 (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1297 (Miss. 1984)). Rather, "[i]n situations which appear to be isolated incidents rather than the normal rule, this Court has stated that it must be the overall circumstances in which a child lives, likely to remain unchanged in the foreseeable future and adversely impacting a child, to warrant a change of custody." *Tucker*, 453 So. 2d at 1297. Moreover, the chancellor must have found that "the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future and, of course, that such change adversely impacts the child." *Id.* Although young Wesley has been subjected to some gross unpleasantries between his parents, the record does not remotely suggest that these episodes are characteristic of the overall circumstances in which he lives. Whether these circumstances are likely to remain unchanged in the foreseeable future appears to be entirely dependent upon his parents' ability to control their hostilities toward each other when with the child.

¶15. The chancellor found that Wesley had not been so adversely affected by his parents' behavior that a change in custody would be in his best interests. To the contrary, the chancellor stated in his written findings of fact:

> Wife has had the primary continuity of care of the minor child since the divorce with the child daily attending St. Mary's Preschool and Day Care in Yazoo City. The Court finds from the evidence that the minor child interacts well with his peers at St. Mary's and is a calm, observant, playful, inquisitive, and exploratory child with advanced verbal skills for a child his age, and is a well-rounded three-year-old. This is reflected not only from the law [sic] witnesses, but from Mrs. Guion, Director of St. Mary's and Defendant's own expert psychiatrist, Dr. Wood Hyatt [sic]. In fact, Dr. Hyatt [sic] commended the primary custodial parent, Wife, for responsibility for the child's advanced verbal skills and other attributes.

Indeed, as the chancellor pointed out, Dr. Touchstone's own expert, Dr. Wood Hiatt, a child psychiatrist, admitted that Wesley appeared to be a secure child with advanced verbal skills. We find therefore that there is substantial evidence in the record to support the chancellor's finding that there was no material change in circumstances adversely affecting the minor child's best interests.

V.

¶16. During the hearing, Dr. Touchstone sought to enter into evidence testimony by Rivers Carpenter, a licenced social worker, that Monna Touchstone had prompted Wesley during an evaluation session, taking the child by the shoulders, looking at him face to face, and telling him, "Tell Mrs. Carpenter about what your daddy did to you. Tell Mrs. Carpenter about how he touched you on your peepee." The chancellor, having previously overruled several objections to less specific testimony regarding the mother's prompting because "some of the actions of the parent would not be within the privilege," struck Carpenter's testimony as privileged pursuant to Miss. R. Evid. 503, the Physician and Psychotherapist-Patient Privilege. Nothing in our Rules of Evidence, however, extends that privilege to licensed clinical social workers.

¶17. Rule 503(b), the general rule of privilege, provides as follows:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

Rule 503(b) limits the privilege to communications with physicians and psychotherapists. Rule 503(a)(3) defines "psychotherapist" as "(1) a person authorized to practice medicine . . . while engaged in the diagnosis or treatment of a mental or emotional condition . . . or (2) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged." *See also* Miss. Code Ann. § 73-31-29. The definitions do not include licenced clinical social workers. Our case law has done nothing to expand the privilege.

¶18. Miss. Code Ann. § 13-1-21 provides a privilege for communications between a patient and physician, osteopath, dentist, hospital, nurse, pharmacist, podiatrist, optometrist or chiropractor. As the Comment to Rule 503 explains, the statute is broader than the Rule. However, licenced clinical social workers do not fall within the definition of any profession to which the Rule or the general privilege afforded by the statute apply.

¶19. Licensed social workers are required to maintain the confidentiality of their client communications pursuant to Miss. Code Ann. § 73-53-29. However, as distinguished from the medical privilege statutes and Rule 503, the social worker-patient privilege is subject to several exceptions, including "(e) When the licensee is called upon to testify in court or administrative hearings concerning matters of adoption, adult abuse, child abuse, child neglect or other matters pertaining to the welfare of clients of the licensee . . ." *See Lauderdale County Department of Human Services v. T.H.G.*, 614 So. 2d 377, 383 (Miss. 1992)(no exception to Rule 503 privilege in termination of parental rights proceedings). Since the welfare of young Wesley was at issue and the specter of child sexual abuse had been raised by his mother's inferences during psychological evaluations of the child which she arranged, the § 73-53-29(e) exception to the privilege would have been applicable, thus allowing Mrs. Carpenter's testimony regarding the mother's "coaching" of the child.

¶20. The chancellor erred in refusing to admit Mrs. Carpenter's testimony pursuant to Rule 503. Even had Mrs. Touchstone sought to exclude the testimony pursuant to § 73-53-29, the child abuse/welfare of the client exception to the social worker-patient confidentiality requirement would have been applicable. Since Mrs. Touchstone, herself, had testified in detail about the session and had admitted that she had pulled down Wesley's pants and told him, "Take Mommy's hand and show me how Daddy touches your peepee," we do not find that exclusion of Mrs. Carpenter's recollection of the incident warrants reversal.

VI.

¶21. It is undisputed that Monna Touchstone bit Teresa Lungrin on the arm one day when Ms. Lungrin accompanied Dr. Touchstone to pick up Wesley in Yazoo City. Both Touchstones testified extensively about the incident as did Dr. Wood Hiatt, Dr. Touchstone's expert witness. When Teresa Lungrin was asked on direct examination to rehash the incident, the chancellor interrupted, indicating that the testimony was repetitive and that "we're not here to prosecute or defend Ms. Touchstone or prosecute or defend Ms. Lungrin." The chancellor then allowed Dr. Touchstone's attorney to make a brief proffer of what Ms. Lungrin would have testified and stated, "We've already heard all this testimony, and let's move on."

¶22. Citing no authority, Dr. Touchstone contends that the chancellor erred in refusing to let Teresa Lungrin testify more fully about the biting incident. We do not consider unsupported assignments of error. *Ellis v. Ellis,* 651 So. 2d 1068, 1073 (Miss. 1995); *Townsend v. Estate of Gilbert,* 616 So. 2d 333, 336 (Miss. 1993). We note, however, that admission of evidence is within the discretion of the chancellor, who should not be held in error for excluding repetitive and probably irrelevant evidence. *Terrain v. Mockbee*, 654 So. 2d 1122, 1130 (Miss. 1995). It does not appear that the chancellor abused his discretion in this or the other evidentiary matters raised by Dr. Touchstone without the benefit of any authority or meaningful discussion.

## VII.

¶23. In her October 4, 1994 Motion to Strike Segments of Appellant's Brief, Monna sought to delete allegations in Touchstone's brief that two-year-old Wesley had been given beer to drink by a neighbor, which, she claims, is unsubstantiated by the record. Dr. Touchstone defended his position in his October 12, 1994 response to the motion. This Court will consider only those matters that actually appear in the record and does not rely on mere assertions in briefs. *American Fire Protection, Inc. v. Lewis,* 653 So.2d 1387, 1390 (Miss. 1995). The Motion to Strike, and, in all fairness, the response to that motion, appear to us to be just another in the series of actions and incidents the parties have used to harass each other at the child's expense, and we therefore, deny that motion.

¶24. Placing her Motion for Attorney Fees or Appropriate Relief Pursuant to Mississippi Supreme Court Rule 28(k) and Rule 38 in the context of the record and briefs now before this Court, Monna Touchstone seeks to sanction her husband (or his attorneys) for what she considers to be a frivolous appeal. Without substantiating her request, she seeks attorney fees for the fifteen hours her attorney has spent responding to his "unsupported assertions."

¶25. Rule 38 of the Rules of Appellate Procedure provides for damages in civil appeals determined by this Court to be frivolous. Given that there are no "good guys" in this case--the record makes it clear that the actions of both parties and their attorneys were responsible for the initiation and perpetuation of this litigation--and that the chancellor's ruling that allowed the exclusion of testimony by a licenced clinical social worker on the basis of Miss. Rule Ev. 503, the patient-psychotherapist privilege, raises questions of first impression, we deny that motion, affirming the chancellor's assessment of half of all court costs incurred to each party. We do, however, take this opportunity to discourage attorneys from using this Court, or the courts below, as an arena for their clients' battles -- be it through the filing of frivolous motions or the raising of allegations unsupported by the evidence or the law.

## VIII.

¶26. The evidence in the record is more a reflection of the parties' animosities toward each other than of either's fitness as parents. Unfortunately, it appears that the child has become a pawn in his parents' games. The record supports the chancellor's finding that there has not been a change in circumstances warranting modification of the custody order. We further see nothing in the evidence to suggest that the father might be able to provide a more suitable environment for young Wesley. Considering, as we must, the best interests of the child, we affirm the chancellor's decision.

¶27. **JUDGMENT IS AFFIRMED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., NOT PARTICIPATING.**